UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES AND ERISA
LITIGATION

                                                                    09 MD 02017 (LAK)

This document applies to:

*In re Lehman Brothers ERISA Litigation*,
No. 08 Civ. 5598 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:


Daniel W. Krasner                          Andrew J. Levander
Mark C. Rifkin                             Kathleen N. Massey
Scott J. Farrell                           Adam J. Wasserman
WOLF HALDENSTEIN ADLER FREEMAN &           Thomas K. Johnson II
HERZ LLP                                   J. Ian Downes
                                           DECHERT LLP
Thomas J. McKenna                          *Attorneys for All Director Defendants Other*
GAINEY & MCKENNA                           *Than Richard S. Fuld, Jr.*

*Plaintiffs' Interim Co-Lead Counsel*

                                           Patricia M. Hynes
                                           Todd S. Fishman
Jonathan K. Youngwood                      ALLEN & OVERY LLP
Michael J. Chepiga                         *Attorneys for Defendant Richard S. Fuld, Jr.*
Janet A. Gochman
SIMPSON THACHER & BARTLETT LLP
*Attorneys for the Plan Committee*
*Defendants*


LEWIS A. KAPLAN, *District Judge.*

           This action is one of many growing out of the 2008 failure of Lehman Brothers

Holdings, Inc. ("Lehman").  It concerns the Lehman Brothers Savings Plan (the "Plan"), which held

Lehman stock and suffered a large loss when the firm failed.  Plaintiffs are Plan beneficiaries.  They sue Lehman's former directors (the "Director Defendants") and members of Lehman's Employee Benefit Plans Committee (the "Plan Committee Defendants"), principally albeit not exclusively on a theory that the defendants knew of Lehman's deteriorating condition but imprudently failed to protect the Plan, thus giving rise to liability under the Employee Retirement Income Security Act ("ERISA").  The Court assumes familiarity with its prior opinion.[1]  The matter is before the Court on defendants' motions to dismiss the Second Consolidated Amended Complaint ("SCAC").[2]

*Facts*

Lehman sponsored the Plan as a retirement savings device for its employees.  The Plan was subject to ERISA and permitted eligible employees to contribute a percentage of their pay to the Plan and to allocate their contributions among different types of accounts.  One option was the Lehman Stock Fund, which invested solely in Lehman's common stock, cash, and short-term fixed income investments.

The Plan designated the Plan Committee as its "Named Fiduciary" and "Plan Administrator."  The Director Defendants were responsible for appointing the Plan Committee. They delegated this power to the board's Compensation Committee.

As is well documented, Lehman experienced significant financial troubles during the

---

[1]  *See In re Lehman Brothers Sec. & ERISA Litig.*, 683 F. Supp.2d 294 (S.D.N.Y. 2010) ("*Lehman ERISA I*").

[2]  DI 159 ("SCAC").

Unless otherwise indicated, citations to docket entries reference the docket in *In re Lehman Brothers ERISA Litig.*, No. 08 Civ. 5598 (LAK).

second and third quarters of 2008.  These culminated in September of that year, when – in rather quick succession – J.P. Morgan Chase, Lehman's clearing bank, demanded $5 billion in collateral from Lehman, Lehman reported a $3.9 billion loss for the third quarter, its share price plummeted, credit agencies warned of downgrading the company's debt and, on September 15, the company declared bankruptcy.[3]

According to the SCAC, the Plan, through the Lehman Stock Fund, continued to hold and invest in Lehman stock before, during and after Lehman's collapse.[4]  On June 10, 2009, the Plan Committee decided that the Plan should liquidate its Lehman stock holdings.[5]  By then, those holdings allegedly were worthless.[6]  Plaintiffs sue the Director Defendants and Plan Committee Defendants – alleged fiduciaries of the Plan – for losses suffered due to the depreciation of Lehman's stock value.

*Procedural History*

I.    *The Action's Inception*

On June 20, 2008 – nearly three months before Lehman declared bankruptcy, but by which point Lehman's stock value had declined substantially – a Plan participant brought a putative class action against a number of alleged Plan fiduciaries claiming principally that the defendants had

---

[3]      *Lehman ERISA I*, 638 F. Supp.2d at 297-98.

[4]      SCAC ¶¶ 3-4.

[5]      *Id.* ¶ 84.

[6]      *Id.*

4

breached their fiduciary obligations by keeping the Plan invested in Lehman stock despite knowledge of Lehman's allegedly precarious and declining financial state.[7]  Shortly thereafter, three similar actions were filed, transferred to this Court and, upon the parties' motion, consolidated with other cases arising out of the same operative facts.[8]  Lead plaintiffs thereafter filed the Consolidated Amended Complaint ("CAC").[9]

II.     *The Consolidated Amended Complaint and* Lehman ERISA I

        The CAC asserted claims against eleven of Lehman's former directors and Wendy Uvino, a member of the Plan Committee.  Count I, asserted against all defendants, "allege[d] that the defendants failed to manage the Plan's assets prudently and loyally in that they continued to acquire and hold Lehman stock (the "prudence claim") and misstated and omitted material information about Lehman's financial condition (the "disclosure claim")."[10]  Count II, also asserted against all defendants, "allege[d] that defendants breached their duty of loyalty by failing to avoid conflicts of interest."[11]  Count III was asserted against the Director Defendants only and alleged that they breached a duty to monitor the Compensation and Plan Committees, which the board of directors had appointed to administer the Plan.

---

[7]

        DI 1.

[8]

        DI 38.

[9]

        DI 53.

[10]

        *Lehman ERISA I*, 683 F. Supp.2d at 300.

[11]

        *Id.* at 303.

In February 2010, the Court dismissed the CAC in *Lehman ERISA I*.[12]  The prudence and disclosure claims failed as against the Director Defendants because there were no allegations that those defendants were Plan fiduciaries for purposes of managing the Plan or communicating with its beneficiaries.  Although Ms. Uvino, a member of the Plan Committee, was a fiduciary for those purposes, the prudence claim failed as against her because the CAC did not allege that she knew of a "dire situation" at Lehman warranting the Plan's divestiture of its Lehman stock holdings.[13]  The disclosure claim also failed as against her because, although Ms. Uvino "had a duty to disclose to beneficiaries negative information about the Plan if she knew or should have known that her failure to do so would cause harm," the CAC was "devoid of any factual allegations that [she] knew or should have known" such information.[14]  Count II – the conflict of interest claim – was dismissed as against all defendants due to insufficient allegations that the defendants had conflicts of interest to begin with.  Count III – the monitoring claim against the Director Defendants – was dismissed because there was no viable primary claim that the Plan Committee had breached a fiduciary duty.

III.    *The Second Consolidated Amended Complaint*

Plaintiffs amended following *Lehman ERISA I*.  The SCAC differs from the CAC in two general respects.  First, whereas Wendy Uvino was the only defendant named in the CAC who

---

[12]

See generally *Lehman ERISA I*, 683 F. Supp.2d 294.

[13]

*Id*. at 301-03.

[14]

*Id*. at 300-01.

had served on Lehman's Plan Committee, the SCAC adds six more Plan Committee defendants.[15]

Second, plaintiffs now have specified the date by which defendants allegedly knew or should have

known that Lehman was in a dire situation: March 16, 2008, when Bear Stearns was sold to JP

Morgan Chase for $2 per share.[16]   Plaintiffs' theory is that the combination of Bear Stearns's

collapse, Lehman's alleged status as the most highly leveraged of the remaining investment banks,

and market-wide subprime risks put Lehman in an obviously dire situation.[17]   The alleged class

period runs from that date until June 10, 2009, when the Plan liquidated its Lehman stock holdings.

     In addition to these two differences, the SCAC contains numerous new allegations

– about fifty pages' worth.[18]   In moving to dismiss, defendants contend that the SCAC's new

allegations do not satisfy the deficiencies identified by the Court in *Lehman ERISA I*.  Plaintiffs

disagree.

*Discussion*

I.    *Legal Standard*

     In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded

factual allegations and draws all reasonable inferences in the plaintiff's favor.[19]  In order to survive

---

15

    SCAC ¶¶ 62-69.

16

    *See, e.g.*, *id.* ¶¶ 4, 259-60.

17

    *Id.* ¶ 261.

18

    *See* DI 161 Ex. 6 (redline comparison of SCAC and CAC).

19

    *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

such a motion, however, "the plaintiff must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[20] Although such motions are addressed to the face of the pleadings, the court may consider also documents attached to or incorporated by reference in the complaint as well as legally required public disclosure documents and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.[21]

## II.    *Claims Against the Plan Committee Defendants*

### A.    *Fiduciary Status*

The Plan Committee allegedly had "complete authority and discretion to control and manage the operation and administration of the Plan."[22]  It is undisputed that the Plan Committee Defendants were Plan fiduciaries for purposes of the claims asserted against them, to wit, Count I's prudence and disclosure claims and Count II's conflict of interest claim.  The question, then, is whether plaintiffs sufficiently have alleged that the Plan Committee Defendants breached those duties.

---

[20]

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, ___ U.S. ____, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

[21]

*ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991)).

[22]

SCAC ¶ 37.

B.      Count I

        1.      Prudence Claim

In *Lehman ERISA I*, the Court held that the *Moench* presumption applies to plaintiffs' prudence claim.[23]   "In *Moench v. Robertson*, the Third Circuit held that an employee stock ownership plan ('ESOP') fiduciary who invests in company stock is 'entitled to a presumption that it acted consistently with ERISA by virtue of that decision.'"[24]   "Plaintiffs can overcome the presumption only by . . . pleading the fiduciary's knowledge at a pertinent time of 'an imminent corporate collapse or other 'dire situation' sufficient to compel an ESOP sell-of.'"[25]

The Court previously dismissed the CAC's prudence claim against Ms. Uvino because that complaint "contain[ed] nothing to support the inference that Ms. Uvino, who worked in human resources, knew or should have known that" "Lehman's collapse became imminent at some time materially before the bankruptcy filing."[26]  Plaintiffs' theory now is that Ms. Uvino and the rest of the Plan Committee Defendants knew or should have known, as of March 16, 2008, the date of Bear Stearns's collapse, that Lehman faced an imminent corporate collapse or some other dire situation.  They base this argument on several kinds of allegations.

First, the SCAC claims that these defendants knew or should have known of

---

[23]

     683 F. Supp.2d at 301.

[24]

     *Id.* (quoting 62 F.3d 553, 571 (3d Cir. 1995) (footnotes omitted)).

[25]

     *Lehman ERISA I*, 683 F. Supp.2d at 301.

[26]

     *Id.* at 302.

9

Lehman's precarious state by virtue of their respective positions at Lehman.[27]  But the allegations

pertaining to these defendants' positions are entirely conclusory.  For example, the SCAC alleges

that:

- "By virtue of his position at Lehman [as Global Head of Rates Strategy], as well as his background and expertise in the mortgage industry, Defendant Arora knew or should have known of Lehman's exposure to catastrophic losses from *inter alia*, trading and holding for its own account in subprime mortgage backed derivatives and mortgage backed securities, and that Lehman had had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages."[28]

- "As a research analyst, Defendant Branca knew about Lehman's growing exposure to the financial crisis long before the Company became insolvent."[29]

- "Defendant Estey's senior executive position makes it more probable than not that she knew about Lehman's growing exposure to the financial crisis long before the Company became insolvent."[30]

These allegations do nothing to connect the Plan Committee defendants to anything specific that

alerted or should have alerted them to the alleged dire situation at Lehman following Bear Stearns's

collapse.

Second, the SCAC makes several allegations about presentations to the Plan

Committee (in most instances without naming specific defendants alleged to have been present) by

Mercer Investment Consulting ("Mercer").

Plaintiffs allege that "[a] document . . . dated November 17, 2006, states that

---

[27]

SCAC ¶¶ 62-70.

[28]

*Id.* ¶ 63.

[29]

*Id.* ¶ 65.

[30]

*Id.* ¶ 66.

[Mercer] made a proposal to the [Plan] Committee that [it] consider instituting limitations on the Lehman Company Stock Fund and better communicate the risk of investing in the Lehman Company Stock Fund to Plan participants."[31]  But this allegation – which pertains to an alleged investment proposal more than a year before the start of the class period – says nothing about a dire situation at Lehman or any concerns about the company's financial outlook.

Plaintiffs allege also that a Mercer evaluation of the Plan's 2007 third quarter performance warned of a potential credit crunch, which carried risks that "[p]ortfolios [would] experience losses with markdowns" and "[b]anks [would be] left holding the bag on LBO deals."[32] But this undated presentation, which may or may not have been during the class period, warned of industry-wide risks – the SCAC does not allege, for example, that the presentation focused on Lehman's own subprime exposure – and spoke of possibilities and potential.  Accepting the well pleaded allegations about it, it was not sufficiently immediate or pointed to warn the Plan Committee of a dire situation at Lehman.

The SCAC alleges also that Mercer made presentations to the Plan Committee in early 2008 detailing the Lehman Stock Fund's poor performance, to wit, that share prices had fallen 18.2 percent during 2007[33] and that, "[a]s of March 31, 2008, the [Lehman] Stock Fund had lost nearly one hundred million dollars of retirement savings in just three months" "mostly [on account

---

31

*Id.* ¶ 198.

32

*Id.* ¶ 235.

33

*Id.* ¶ 249.

of] the -42 percent return for the first quarter of 2008."[34]  Such allegations, however, do not overcome the *Moench* presumption.  "'[M]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption.'"[35]  Companies are expected to undergo periodic swings – even significant ones.  More than these occurrences (which may prove ominous in hindsight) are needed to overcome the presumption.[36]  Indeed, courts have held that far greater decreases in share price did not rebut it.[37]

Fourth, the SCAC alleges that, by June 26, 2008, Ms. Uvino was aware of the initial complaint filed in this action.[38]  Thus, according to plaintiffs, she was aware of the allegations of Lehman's subprime exposure and that the Plan Committee had breached its fiduciary duty by continuing to invest in Lehman stock.  Even if awareness of that complaint sufficed to plead knowledge, it would do so only for Ms. Uvino.[39]  More importantly, the allegation that a member of the Plan Committee was aware of the allegations of the CAC is not a plausible assertion of the

---

[34]

*Id.* ¶¶ 284-85.

[35]

*Quan v. Computer Sciences Corp.*, 623 F.3d 870, 884 (3d Cir. 2010) (quoting *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004)).

[36]

*E.g. Peabody v. Davis*, 636 F.3d 368, 375 (7th Cir. 2011) (*Moench* presumption rebutted where "a widely-known and permanent change in the regulatory environment had undermined [company's] core business model").

[37]

*See Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 255 n.12 (5th Cir. 2008) (collecting cases where presumption wasn't rebutted by, *inter alia*, 75 percent and 80 percent declines).

[38]

SCAC ¶ 327.

[39]

Plaintiffs' conclusory allegation to the contrary is purely speculative.  *See id.* ("Thus, by no later than June 26, 2008, Defendant Uvino was unquestionably aware of the nature of Plaintiffs' allegations concerning, *inter alia*, Lehman's subprime exposure. The other Defendants sued in June 2008 were no doubt similarly aware.").

requisite knowledge.  The initial complaint in this action, like any complaint, consisted only of allegations, not evidence.  Furthermore, it was less detailed than the CAC, which itself failed to state a claim upon which relief could have been granted. It therefore was incapable of conveying any real information that Lehman was in a dire – or any other – situation.

Finally, plaintiffs allege that Bear Stearns's collapse ultimately is what put, or should have put, defendants on notice of the allegedly dire situation of Lehman.  But this argument is not supported by any concrete factual allegations sufficient to make a plausible claim.  The SCAC states repeatedly that Bear Stearns failed due to a "run on the bank."[40]  It repeats also that Lehman was the most highly leveraged of the remaining large investment banks.[41]  But it alleges no facts explaining *why* Bear Stearns suffered a run, let alone why those circumstances alerted or ought to have alerted Lehman that it would suffer the same fate.  Bear Stearns's failure, coupled with the known risks about mortgaged lending, no doubt was a cause for concern at Lehman and the other firms.  But cause for concern is not a dire situation.[42]

As the SCAC fails to allege that the Plan Committee Defendants knew or should have known of a dire situation at Lehman, the prudence claim against those defendants fails.

---

[40]

SCAC ¶¶ 4, 67, 162.

[41]

*Id.* ¶¶ 4, 67, 162, 163, 472, 492.

[42]

It bears noting that all of the red flags alleged in the SCAC – Lehman's struggles, the risks of mortgage lending and Bear Stearns's failure – were public knowledge.  But the SCAC alleges that a Korean bank, notwithstanding that knowledge, offered to buy Lehman at 1.5 times book value in August 2008.  *Id.* ¶ 341.

2.      *Disclosure Claim*

Plaintiffs argue that the Plan Committee Defendants breached the fiduciary disclosure duty.   In substance, the SCAC makes two disclosure claims.   It accuses the Plan Committee defendants of breaching an affirmative duty to disclose known negative information about Lehman, as well as a negative duty to refrain from making material misrepresentations or omissions about the company.

i.      *Affirmative Disclosure Claim*

ERISA fiduciaries have an affirmative duty to be honest and complete with plan participants.[43]  Thus, as the Court stated in *Lehman ERISA I*, Lehman's Plan Committee members "had a duty to disclose to beneficiaries negative information about the Plan if [they] knew or should have known that [their] failure to do so would cause harm."[44]  It must be considered, however, the information to which that obligation applies.

An ERISA fiduciary "must discharge his duties . . . for the *exclusive* purpose' of providing *benefits* to them."[45]  In light of the specificity with which ERISA describes this obligation, the Second Circuit has stated that it is "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure."[46]  The statute does not require

---

[43]

   *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 88 (2d Cir. 2001).

[44]

   683 F. Supp.2d at 300.

[45]

   *Devlin*, 274 F.3d at 88 (quoting 29 U.S.C. § 1104(a)(1)(A)) (emphases added).

[46]

   *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997).

14

plan fiduciaries to disclose information pertaining to plan investments as opposed to plan benefits. Thus, a number of courts have held that ERISA fiduciaries "have no affirmative duty . . . to disclose information about the company's financial condition to plan participants."[47]  Although the Court recognizes that other courts have found such a duty,[48] it is persuaded by the former line of cases.

As the Plan Committee Defendants had no affirmative duty to disclose information pertaining to Lehman's financial condition, the affirmative disclosure claim fails.[49]


### ii.      Negative Disclosure Claim

Of course, to the extent that a fiduciary actively provides financial information to a plan participant, the fiduciary must do so accurately and completely.  The Court therefore turns to the question of whether the SCAC states a claim that the Plan Committee defendants breached their duty not to make misrepresentations or misleading omissions.

Plaintiffs argue that the Plan Committee Defendants made material misrepresentations and omissions to Plan beneficiaries by incorporating into the Summary Plan

---

[47]
        *Gearren v. McGraw-Hill Cos., Inc.*, 690 F. Supp.2d 254, 271-72 (S.D.N.Y. 2010).  *See also In re Bank of Am. Litig.*, 756 F. Supp.2d 330, 356 (S.D.N.Y. 2010); *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *22 (S.D.N.Y. Aug. 31, 2009).

[48]
        *See In re AIG ERISA Litig. II*, No. 08 Civ. 5722 (LTS), 2011 WL 1226459, *8 (S.D.N.Y. Mar. 31, 2011); *In re Worldcom, Inc.*, 263 F. Supp.2d 745, 765 (S.D.N.Y. 2003).

[49]
        The Court need not decide whether plan fiduciaries must disclose such information if a plan participant asks for it, as plaintiffs do not allege any such request.  *See Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 10 (2d Cir. 1997); *Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-cv-10610, 2011 WL 1261196, at *17-18 (E.D. Mich. Mar. 31, 2011).

Description ("SPD") statements that contained such misrepresentations and omissions.[50]  "ERISA fiduciaries who incorporate SEC [filings] by reference into a summary plan description violate ERISA [if] they 'intentionally connect the content of those SEC filings to statements about plan benefits.'"[51]  The complained-of incorporation, however, occurred on January 1, 2008 – more than two months before the start of the class period.[52]  Thus, the only representations contained in Lehman's SEC filings that the Plan Committee defendants intentionally connected to the SPD were made before the class period.  Of course, the incorporation was forward-looking inasmuch as the SPD purported to incorporate future SEC filings.[53]  But it cannot plausibly be said that the Plan Committee defendants intentionally connected to the SPD statements that had not yet been made.[54]

As the SCAC does not allege that the Plan Committee Defendants intentionally

---

[50]

It is true, as defendants point out, that misstatements and omissions are actionable under ERISA only when made in a fiduciary capacity.  SEC statements themselves typically are made in a corporate rather than fiduciary capacity. *Lehman ERISA I*, 683 F. Supp.2d at 300; *In re SLM Corp. ERISA Litig.*, No. 08 Civ. 43334 (WHP), 2010 WL 3910566, at *9-10 (S.D.N.Y. Sept. 24, 2010).  But the SCAC's disclosure claim is not asserted against the Director Defendants, who allegedly made the representations at issue, but against the Plan Committee Defendants, who allegedly incorporated the SEC statements into the SPD.  *See* DI 160 ("Pl. Mem.") at 55 n.57; SCAC ¶¶ 87.  Such incorporation is done in a fiduciary capacity.  *See In re Morgan Stanley ERISA Litig.*, 696 F. Supp.2d 345, 361-63 (S.D.N.Y. 2009).

[51]

*In re UBS AG ERISA Litig.*, No. 08 Civ. 6696 (RJS), 2011 WL 1344734, at *10 (S.D.N.Y. Mar. 24, 2011) (quoting *Gearren*, 690 F. Supp.2d at 273).

[52]

SCAC ¶ 87.

[53]

*Id.* ¶ 88.

[54]

*Cf.* Pl. Mem. at 57 ("The fact that the SEC filings originally were prepared by others . . . has no bearing whatsoever on the [Plan] Committee Defendants' liability for the *subsequent* act of incorporating Lehman's materially false and misleading SEC filings into Plan communications." (emphasis added)).

connected any misrepresentations or omissions in Lehman's SEC filings to the SPD, it fails to state a negative disclosure claim against those defendants.

### C.    Count II

The crux of plaintiffs' conflict of interest claim is that "defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities."[55]  Like the CAC,[56] however, the SCAC is devoid of any allegations that the Plan Committee defendants had any conflicts of interest that violated or even threatened to violate the ERISA duty of loyalty.  This claim therefore fails.[57]

### III.    Claims Against the Director Defendants

### A.    Fiduciary Status

The SCAC alleges that the Director Defendants were fiduciaries to the extent that they appointed the Compensation Committee, which in turn appointed the Plan Committee, to

---

[55]    SCAC ¶ 482.

[56]    *See Lehman ERISA I*, 683 F. Supp.2d at 303.

[57]    Indeed, in opposing the motion to dismiss, plaintiffs did not even attempt to defend their conflict claims against the Plan Committee Defendants.  *See* Pl. Mem. at 65-66.

manage the Plan.[58]   The Director Defendants do not dispute that they were fiduciaries for that purpose.

B.    Count I

Although Count I – comprising the prudence and disclosure claims – is asserted against the Director Defendants as well as the Plan Committee Defendants, the Director Defendants are not proper defendants to these claims.

"Persons who are fiduciaries by virtue of the exercise of control and authority over a plan are subject to fiduciary duties only 'to the extent' they have or have exercised such power."[59] As noted above, the prudence claim relates to the management of the Plan[60] and the disclosure claim to communications with Plan participants.[61]   Plaintiffs concede that the Director Defendants were not fiduciaries for these purposes.[62]   Indeed, as alleged by the SCAC itself, "[t]he complete authority and discretion to control and manage the operation and administration of the Plan [was] placed in the [Plan] Committee of the Company."[63]   Count I therefore must be dismissed as against the Director Defendants.

---

[58]     SCAC ¶¶ 36.  *See also* Pl. Mem. at 22-23.

[59]     *Lehman ERISA I*, 683 F. Supp.2d at 299.

[60]     SCAC ¶ 469.

[61]     *Id.* ¶ 471.

[62]     *See* Pl. Mem. at 27-28.

[63]     SCAC ¶ 37.

C.      *Count II*

As with the conflict of interest claim against the Plan Committee Defendants, the conflict claim against the Director Defendants is entirely conclusory.  There are no allegations as to what personal interests the Director Defendants had or elevated above those of the Plan participants.

The sole possible exception is Mr. Fuld, but the conflict claim against him ultimately fails as well.  The only concrete conflict allegation against Mr. Fuld is that he sold his personal holdings of Lehman stock for profit.[64]  But even that assertion is insufficient.  As stated in *Lehman ERISA I*, an allegation that a plan fiduciary sold stock ordinarily does not suffice to state a conflict of interest claim.[65]  Moreover, Mr. Fuld's stock sale allegedly occurred before the class period.[66]  Thus, the SCAC does not sufficiently allege that Mr. Fuld or any other defendant had any conflict of interest during the pertinent period.

D.      *Count III*

Count III claims that the Director Defendants breached their fiduciary duty to appoint and properly monitor the Plan Committee Defendants.

1.      *Duty to Appoint Claim*

It is undisputed that the Director Defendants had a fiduciary duty to act prudently

---

[64]    *Id.* ¶ 453.

[65]    683 F. Supp.2d at 303 n.667.

[66]    SCAC ¶ 453.  *See also* DI 169 ("Director Reply Mem.") at 18 n.17.

appointing the Benefits and Plan Committees for the Plan's management.   The SCAC alleges a breach of this duty, but only in the most conclusory of fashions:

> "To the extent that the Director Defendants, including the Compensation Committee Defendants, appointed members of the Benefit Committee who were insufficiently informed to determine when, at the beginning of the Class Period, the Company Stock had become imprudent for retirement savings, the Director Defendants, including the Compensation Committee Defendants, breached their fiduciary duty by failing to appoint fiduciaries who were able to act in the best interests of the Plans and their participants."[67]

This allegation, unsupported by even the barest factual allegations, fails to make a plausible claim that the Director Defendants breached their duty.   Indeed, it does not even squarely claim that they actually did appoint unqualified plan fiduciaries.


2.      *Duty to Monitor Claim*

Plaintiffs argue that the Director Defendants' appointment duty carried with it a duty to monitor the Benefits and Plan Committees.   The Second Circuit has not decided the question whether and to what extent ERISA imposes such a duty.[68]   In the last analysis, though, the Court need not reach that issue.

The Director Defendants move to dismiss the monitoring claim, *inter alia*, on the ground that it is derivative of the primary claim that the Plan Committee Defendants breached a duty of prudence and therefore fails along with that contention.   Although plaintiffs subtly suggest that the monitoring claim is not derivative of the prudence claim,[69] they do not seriously argue  against

---

[67]

SCAC ¶ 437.  *See also* Pl. Mem. at 22-23.

[68]

*In re Bank of Am. Corp.*, 756 F. Supp.2d 330, 359 (S.D.N.Y. 2010).

[69]

*See* Pl. Mem. at 23 n.29, 25-26.

20

this premise which, in any case, is supported by the weight of authority.[70]  Furthermore, this Court and the parties – including the plaintiffs – have been operating on the assumption that the monitoring claim derives from the prudence claim since the defendants moved to dismiss the CAC.[71]  Thus, the monitoring claims fail because the SCAC fails to state a claim that the Plan Committee defendants breached a primary fiduciary duty.

*Conclusion*

Defendants' motions to dismiss the SCAC [09 MD 2017 (LAK), docket items 368, 369, 373; 08 Civ. 5598 (LAK), docket items 149, 150, 154] are granted.  The Clerk shall enter judgment and close the case.

SO ORDERED.

Dated:        October 5, 2011

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[70]
*See Pugh v. Tribune Co.*, 521 F.3d 686, 702 (7th Cir. 2008); *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 n.15 (3d Cir. 2007); *In re Bank of Am. Corp.*, 756 F. Supp.2d 330, 359 (S.D.N.Y. 2010); *In re Bausch & Lomb Inc. ERISA Litig.*, No.106 Civ. 6297, 2008 WL 5234281, at *10 (W.D.N.Y. Dec. 12, 2008).  *But see In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, Nos. MDL 1500, 02 Civ. 8853 (SWK), 2005 WL 563166, at *7 (S.D.N.Y. Mar. 10, 2005).

[71]
*See Lehman ERISA I*, 683 F. Supp.2d at 303.  *See also* Director Mem. at 19-20; Pl. Mem. at 27, 62 n.65; DI 66 at 43-45; DI 86 at 44.