UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES AND                              09-md-2017 (LAK)
ERISA LITIGATION

This document applies to:
*In re Lehman Brothers ERISA Litigation*, 08-cv-5598 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Daniel W. Krasner                        Jonathan K. Youngwood
Mark C. Rifkin                           Janet A. Gochman
Michael Jaffe                            SIMPSON THACHER & BARTLETT LLP
Matthew Guiney                           *Attorneys for the Plan Committee Defendants*
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
                                         Todd S. Fishman
Thomas J. McKenna                        ALLEN & OVERY LLP
Gregory M. Egleston                      *Attorney for Defendant Richard S. Fuld, Jr.*
GAINEY MCKENNA & EGLESTON

*Plaintiffs' Co-Lead Counsel*

LEWIS A. KAPLAN, *District Judge.*

This case is brought on behalf of beneficiaries of the Lehman Brothers Savings Plan

(the "Plan"), an employee stock ownership plan ("ESOP") that held stock of Lehman Brothers

Holdings, Inc. ("Lehman") and suffered a large loss when Lehman failed in the 2008 financial crisis.

Plaintiffs initially sued Lehman's former directors (the "Director Defendants")[1] and members of Lehman's Employee Benefit Plans Committee (the "Plan Committee Defendants"),[2] although the only remaining Director Defendant is Richard S. Fuld, Lehman's former chairman and chief executive officer.[3]   Lehman allegedly violated the Employee Retirement Income Security Act ("ERISA")[4] by imprudently continuing to keep Plan assets invested in Lehman stock despite Lehman's deteriorating condition.

  The Court granted two previous motions to dismiss this case,[5] and the latter dismissal was affirmed by the Second Circuit in *Rinehart v. Akers*.[6]  Plaintiffs sought review by the Supreme Court, which granted *certiorari*, vacated the judgment, and remanded the case in light of its decision

---

[1]

  The Director Defendants initially included Richard S. Fuld, Jr., Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Jerry A. Grundhofer, Roland A. Hernandez, Henry Kaufman, and John D. Macomber.  *See* Second Consol. Am. Compl. [DI 159] ¶¶ 24-34.  All Docket Item ("DI") notations refer to case no. 08-cv-5598 unless otherwise indicated.

[2]

  The Plan Committee Defendants include Wendy M. Uvino, Amitabh Arora, Mary Pat Archer, Michael Branca, Evelyne Estey, Adam Feinstein, and David Romhilt.  Third Consol. Am. Compl. [DI 233-1] ¶¶ 59-65.

[3]

  *See* Stipulation (Dec. 10, 2014) [DI 236].

[4]

  *See* 29 U.S.C. § 1104(a)(1)(B) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.").

[5]

  *In re Lehman Bros. Sec. & ERISA Litig.*, No. 08-cv-5598 (LAK), 2011 WL 4632885 (S.D.N.Y. Oct. 5, 2011) ("*Lehman ERISA II*"); *In re Lehman Bros. Sec. & ERISA Litig.*, 683 F. Supp. 2d 294 (S.D.N.Y. 2010) ("*Lehman ERISA I*").

[6]

  722 F.3d 137 (2d Cir. 2013).

in *Fifth Third Bancorp v. Dudenhoeffer*.[7]  The parties then filed cross-motions, with plaintiffs moving to amend the Second Consolidated Amended Complaint (the "SCAC")[8] by replacing it with a Third Consolidated Amended Complaint (the "TCAC") and defendants renewing their motion to dismiss the SCAC.[9]  The Court granted plaintiffs' motion to amend the SCAC without prejudice to defendants' arguments in favor of dismissal.[10]  The Court now considers whether the TCAC plausibly alleges claims upon which relief may be granted.[11]

*Procedural History*

The Court assumes familiarity with its prior opinions as well as with the Second Circuit's decision in *Rinehart*.  A brief overview nonetheless is helpful in understanding the Court's disposition of the present motions.

---

[7]

134 S. Ct. 2459 (2014); *see also* 134 S. Ct. 2900 (2014) (remanding *Rinehart* in light of *Dudenhoeffer*).

[8]

Pltfs.' Motion to Amend [DI 231].

[9]

Director Defs.' Motion to Dismiss [DI 227]; Plan Comm. Defs.' Motion to Dismiss [DI 243].

[10]

Pretrial Order No. 102 (May 20, 2015) [MDL DI 1651].

[11]

*See* Director Defs.' Mem. in Support of their Motion to Dismiss [DI 228]; Plan Comm. Defs.' Mem. in Support of their Motion to Dismiss [DI 244]; Pltfs.' Mem. Opposing the Motions to Dismiss and in Support of their Motion to Amend [DI 232]; Reply Mem. of Director Def. Richard Fuld [DI 237]; Plan Comm. Defs.' Reply Mem. [DI 239]; Pltfs.' Reply Mem. [DI 241].

*I.    The Court's Dismissal of the SCAC*

      The SCAC included three counts.  Count I alleged that defendants violated their duty to manage the Plan prudently because they (i) knew or should have known that Lehman stock was not a "suitable and appropriate" investment,[12] (ii) failed to provide complete and accurate information to plan members regarding risks facing Lehman,[13] and (iii) knowingly concealed or otherwise enabled other defendants' failure to disclose material adverse information regarding Lehman's exposure to risk.[14]  Count II alleged that defendants breached their duty to avoid conflicts of interest by, among other things, not engaging independent ESOP fiduciaries.[15]  Count III alleged that the Director Defendants (i) breached their duties to act prudently in appointing members of the Compensation Committee (who in turn appointed members of the Plan Committee) and (ii) inadequately monitored the Plan Committee Defendants.[16]

      The Court dismissed the SCAC.[17]  As to Count I, the Court applied the presumption of prudence adopted in *Moench v. Robertson*,[18] under which plaintiffs could sustain their claim that the Plan Committee Defendants imprudently managed the Plan only by pleading facts indicating

---

[12]

      SCAC ¶ 472.

[13]

      *Id.* ¶ 474.

[14]

      *Id.* ¶ 476.

[15]

      *Id.* ¶ 482.

[16]

      *Id.* ¶¶ 490-92.

[17]

      *Lehman ERISA II*, 2011 WL 4632885, at *8.

[18]

      62 F.3d 553 (3d Cir. 1995).

defendants' "knowledge at a pertinent time of an imminent corporate collapse or other dire situation."[19]  The Court determined that plaintiffs' imprudence allegations were conclusory, that fluctuations in Lehman's stock price did not overcome the *Moench* presumption, and that the SCAC failed to allege facts supporting a conclusion that the Plan Committee Defendants knew or should have known of a dire situation at Lehman.[20]  In addition, the Court dismissed Count I's disclosure claims because it concluded that there is no affirmative duty to disclose inside information about a company's financial condition to plan participants and that incorporation of Lehman's SEC filings into Plan communications was not an actionable misrepresentation or omission.[21]

The Court dismissed Count II's conflict of interest claims because they were based on wholly conclusory allegations.[22]

The Court dismissed Count III on two principal grounds.  First, it concluded that plaintiffs' allegation that the Director Defendants acted imprudently in appointing members of the Plan Committee was "unsupported by even the barest factual allegations."[23]  Second, a legally sufficient improper monitoring claim necessarily is derivative of a primary breach of duty and plaintiffs' claim therefore could not survive because there was no viable claim against the Plan

---

[19]   *Lehman ERISA II*, 2011 WL 4632885, at *3 (quoting *Lehman ERISA I*, 683 F. Supp. 2d at 301).

[20]   *Id.* at *4-5.

[21]   *Id.* at *5-6.

[22]   *Id.* at *6-7.

[23]   *Id.* at *7.

Committee Defendants.[24]

II.     *The Second Circuit's Affirmance*

      The Second Circuit affirmed the dismissal of the SCAC in *Rinehart*.  The parties disagree over the extent to which *Dudenhoeffer* has superseded *Rinehart*'s key conclusions.

      *First*, *Rinehart* applied the *Moench* presumption of prudence in determining that the SCAC failed to state a claim that the Plan Committee Defendants, given public information, breached their fiduciary duties.  The Second Circuit concluded that plaintiffs did not "plausibly allege[] that the [Plan Committee Defendants] knew or should have known that Lehman was an imprudent investment given the mixed signals with which the fiduciaries grappled."[25]

      *Second*, *Rinehart* considered plaintiffs' allegation that the Plan Committee Defendants acted imprudently by failing to undertake an investigation into nonpublic information regarding the riskiness of Lehman stock.  The Second Circuit concluded that those defendants had no duty to undertake such an investigation, largely because imposing such a requirement would force plan fiduciaries into constant conflicts between "adher[ing] to their duty of prudence by limiting further investment in the improvident asset" and "risking liability for insider trading" by divesting an ESOP of company stock.[26]  "Given the conflicted state of the law," the only "reasonable approach" was not to construe the duty of prudence "to include an obligation to affirmatively seek out material,

---

[24]
      *Id.* at *8.

[25]
      722 F.3d at 151.

[26]
      *Id.* at 147.

nonpublic information pertaining to plan investments."[27]

   *Third*, *Rinehart* addressed plaintiffs' contention that the Director Defendants breached their duties to monitor the Plan Committee Defendants because they failed to provide them with inside information.  It affirmed this Court's dismissal of that claim on the narrow ground that it was derivative of the failed prudence claim.  But the Second Circuit addressed also the underlying question of whether a duty to inform even exists, stating that it would be "unlikely to conclude" that ERISA imposed such a duty on appointing fiduciaries.[28]  In light of the Circuit's prior decision in *In re Citigroup ERISA Litigation*,[29] which concluded that ERISA fiduciaries have no obligation to furnish nonpublic information to plan beneficiaries, the "argument that the [Plan Committee Defendants] should have been privy to inside information so that they could act on it on behalf of plan-participants [was] simply not persuasive."[30]

### III. Dudenhoeffer

   *Dudenhoeffer* is pivotal because it rejected the *Moench* presumption of prudence and held instead that ESOP fiduciaries are subject to the same duty of prudence as all other ERISA

---

[27]  *Id.*

[28]  *Id.* at 154.

[29]  662 F.3d 128 (2d Cir. 2011).

[30]  *Rinehart,* 722 F.3d at 154.

8

fiduciaries.[31]  Nevertheless, the Supreme Court there pointed out that *Bell Atlantic Corp. v Twombly*[32] and *Ashcroft v. Iqbal*[33] limit ESOP claims in two respects.

First, it stated that "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible [and therefore legally insufficient] as a general rule, at least in the absence of special circumstances."[34]

Second, the Court sharply constrained—without necessarily eliminating—ERISA claims based on nonpublic information.  It directed lower courts "to bear in mind that the duty of prudence, under ERISA as under the common law of trusts, does not require a fiduciary to break the law."[35]  It nonetheless suggested that it *might* be possible to allege a claim for breach of fiduciary duty based on nonpublic information without implicating the insider trading laws.  To sustain such a claim—assuming a fiduciary possessed inside information bearing adversely on a plan's continued investment in the stock of its sponsor—"a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund

---

[31]

134 S. Ct. at 2467 (discussing 29 U.S.C. § 1104(a)(1)(B)).

[32]

550 U.S. 544 (2007).

[33]

556 U.S. 662 (2009).

[34]

134 S. Ct. at 2471 (material in brackets added).

[35]

*Id.* at 2472.

than to help it."[36]  Such actions might include disclosure or declining to invest further in the securities of the ESOP sponsor, although courts "should consider the extent to which an ERISA-based obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws."[37]

IV.     *The TCAC*

In light of *Dudenhoeffer*, plaintiffs have narrowed their claims against the Plan Committee Defendants and Fuld.[38]

Count I of the TCAC alleges that the Plan Committee Defendants knew or should have known, based on *public* information, that investment in Lehman had become increasingly risky throughout 2008 and that these defendants breached their fiduciary duty by failing to consider the prudence of continuing to invest in Lehman during this period.[39]  Plaintiffs assert that, in light of public information available at the time, "the sophisticated Defendant fiduciaries [should have] conclude[d] by no later than June 9, 2008 that Lehman stock was far too risky for retirement savings and that they should have stopped purchasing additional shares and divested the Plan of its current

---

[36]     *Id*.

[37]     *Id.* at 2473.

[38]     The TCAC also shortens the relevant class period.  The SCAC alleged a class period extending from March 16, 2008 to June 10, 2009.  The TCAC alleges a period beginning instead on June 9, 2008.  TCAC ¶ 3; DI 232 at 2 n.3.

[39]     TCAC ¶¶ 412-26.

Lehman stock holdings."[40]

In Count II, plaintiffs attempt to insulate this claim against *Dudenhoeffer*'s statement that "allegations that [an ERISA] fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances."[41]   Count II alleges that there were "special circumstances affecting the reliability of the market price [of Lehman stock] as an unbiased assessment of [Lehman's] value."[42]   Plaintiffs point to orders issued by the Securities and Exchange Commission ("SEC") in July 2008 that prohibited short selling the securities of certain large financial services firms, including Lehman.   According to the TCAC, "the SEC concluded that the market for Lehman stock faced unusual and extraordinary circumstances"[43] and the defendants therefore "imprudently relied on the market's evaluation of [Lehman stock] during the Class Period."[44]

Plaintiffs assert two additional claims in the alternative.

Count III alleges that the Plan Committee Defendants breached their fiduciary duties by failing to investigate *nonpublic* information regarding the risks facing Lehman.[45]   Plaintiffs assert

---

[40]

*Id.* ¶ 417.

[41]

*Dudenhoeffer*, 134 S. Ct. at 2471.

[42]

TCAC ¶ 429.

[43]

*Id.* ¶ 315 (internal quotation marks omitted).

[44]

*Id.* ¶ 318.

[45]

*Id.* ¶¶ 433-47.

that the Plan Committee Defendants had a fiduciary obligation to conduct an "appropriate independent investigation" into the riskiness of Lehman stock during the class period and that, had they done so, they would have uncovered nonpublic information revealing the imprudence of continuing to invest in the company.[46]

Finally, Count IV claims that defendant Fuld inadequately monitored the Plan Committee Defendants.  It alleges also that Fuld possessed nonpublic information about the risks facing Lehman and breached an alleged duty to share it with the Plan Committee Defendants.[47]  The viability of this claim depends on the correctness of plaintiffs' view that ERISA requires a monitoring fiduciary to "provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan."[48]

## Discussion

### I.     Legal Standards

In passing on a Rule 12(b)(6) motion, a court accepts as true all well-pleaded factual allegations and "draw[s] all reasonable inferences in the plaintiff's favor."[49]  Nevertheless, in order to survive such a motion, a complaint must allege facts sufficient "to state a claim to relief that is

---

[46]

     *Id.* ¶ 436.

[47]

     *Id.* ¶¶ 448-59.

[48]

     *Id.* ¶ 452.

[49]

     *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).

plausible on its face."[50]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[51]

## II.     Claims Against the Plan Committee Defendants

### A.     Fiduciary Status

In "every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."[52]  Whether a person acts as a fiduciary turns on the ERISA statute itself, which states:

> "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."[53]

The Lehman Plan "designated the Plan Committee as its 'Named Fiduciary' and 'Plan Administrator.'"[54]  The Plan Committee allegedly had "complete authority and discretion to control

---

[50]

   *Twombly*, 550 U.S. at 570.

[51]

   *Iqbal*, 556 U.S. at 678.

[52]

   *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

[53]

   29 U.S.C. § 1002(21)(A).

[54]

   TCAC ¶ 47.

and manage the operation and administration of the Plan."[55]  Defendant Fuld—along with the other Director Defendants no longer named in the TCAC—was "responsible for appointing the Plan Committee . . . [and] delegated this power to the board's Compensation Committee."[56]

It is undisputed that the Plan Committee Defendants were fiduciaries for purposes of the claims asserted against them in Counts I through III.  The question, then, is whether the TCAC sufficiently alleges that the Plan Committee Defendants breached their fiduciary duties.

### B.    Counts I and II: Breach of Fiduciary Duty Based on Public Information

Plaintiffs allege that the Plan Committee Defendants met only twice during the period from June 9, 2008 to September 15, 2008 and that the minutes of those meetings show that they "never even once discussed what should be done with the millions of Lehman shares held in the Plan or whether to consult lawyers or investment advisers on the advisability of continuing to hold those shares."[57]  Plaintiffs assert that these defendants breached their fiduciary duty "by failing to monitor, evaluate and remove Lehman stock from the Plan when it became an imprudent investment option."[58]

ERISA imposes an obligation on fiduciaries to "act in a prudent manner 'under the circumstances then prevailing,'"[59] a standard that eschews hindsight and focuses instead on the

---

[55]     *Id.* ¶ 35.

[56]     *Lehman ERISA II*, 2011 WL 4632885, at *1.

[57]     DI 232 at 10.

[58]     TCAC ¶ 422.

[59]     *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (quoting 29 U.S.C. § 1104(a)(1)(B)).

"extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed."[60]   In other words, ERISA's duty of care "requires prudence, not prescience."[61]

In its previous examination of plaintiffs' claims of imprudence based on public information, the Court concluded that while "known risks about mortgaged lending" may have been a "cause for concern at Lehman,"[62] such concerns did not necessarily indicate that Lehman stock had become dramatically riskier.  In *Rinehart*, the Second Circuit likewise surveyed plaintiffs' allegations and failed to discern any plausible claim that "that the [Plan] Committee Defendants knew or should have known that Lehman was an imprudent investment given the mixed signals with which the fiduciaries grappled throughout the class period."[63]   At most, the SCAC alleged that the Plan Committee Defendants "would have possessed comparable knowledge to the market analysts and investors who helped maintain Lehman's substantial market capital even immediately prior to the company's bankruptcy."[64]   The TCAC, too, fails plausibly to allege that public information about Lehman was so clearly negative in mid-to-late 2008 that the Plan Committee Defendants acted imprudently.

To be sure, this Court and the Second Circuit evaluated the SCAC under a

---

[60]

*Id.* (internal quotation marks omitted).

[61]

*Id.* (quoting *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)).

[62]

*Lehman ERISA II*, 2011 WL 4632885, at *5.

[63]

*Rinehart*, 722 F.3d at 151.

[64]

*Id.* at 150.

presumption of prudence that, after *Dudenhoeffer*, no longer governs ERISA claims.  Even had the

Court instead examined the SCAC through the prism of *Twombly* and *Iqbal*, however, its conclusion

that the SCAC failed to allege a plausible breach of duty claim against the Plan Committee

Defendants would have been the same.

The substitution of the TCAC in lieu of the SCAC does not change this result.  The

TCAC's scattered changes[65] include new descriptions of allegedly ominous news articles,[66] volatility

in Lehman's stock price,[67] increased trading volumes,[68] rising costs of Lehman credit default swaps

and other investment instruments,[69] downgrades from various ratings agencies,[70] and criticism from

investment analysts.[71]  These new bits of information do no more than add marginally to the

cacophony of "mixed signals" described in the SCAC.[72]  They do not nudge the allegations of the

TCAC across the plausibility threshold.[73]

---

[65]

See Krasner Decl. Ex. B [DI 233-2] (redline comparing the TCAC to the SCAC).

[66]

TCAC ¶¶ 226-27, 297, 320.

[67]

*Id.* ¶ 265.

[68]

*Id.* ¶ 345.

[69]

*Id.* ¶¶ 337-38.

[70]

*Id.* ¶¶ 290, 298, 321.

[71]

*Id.* ¶¶ 252, 258.

[72]

*Rinehart*, 722 F.3d at 151.

[73]

The Court previously recognized that, under pre-*Twombly* pleading standards, plaintiffs
may well have had a more viable claim.  *See Lehman ERISA I*, 683 F. Supp. 2d at 302-03
(discussing the prior rule of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that a complaint

Moreover, *Dudenhoeffer* appears to have "*raised* the bar for plaintiffs seeking to bring a claim based on a breach of the duty of prudence."[74]  Given that "allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances,"[75] *Dudenhoeffer* seemingly has foreclosed any such claim against the Plan Committee Defendants. While plaintiffs insist that their claim should survive notwithstanding *Dudenhoeffer*, none of their arguments is persuasive.

*First*, plaintiffs suggest that *Dudenhoeffer*'s limitation on claims based on public information applies only to assertions "that the market was over- or undervaluing the stock."[76]  This, they argue, is different from alleging that a stock has become excessively risky.  Plaintiffs contend that an interpretation of *Dudenhoeffer* that treated risk-based claims and valuation-based claims identically would allow "fiduciaries to gamble away trust assets" even as those fiduciaries' investment choices became increasingly reckless.[77]  They rely on a recent decision from the Western District of New York, *Gedek v. Perez*.[78]

---

should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts . . . which would entitle him to relief.").

[74]

*In re UBS ERISA Litig.*, No. 08-cv-6696 (RJS), 2014 WL 4812387, at *8 n.11 (S.D.N.Y. Sept. 29, 2014) (emphasis in original).

[75]

*Dudenhoeffer*, 134 S. Ct. at 2471.

[76]

*Id.*

[77]

DI 241 at 3.

[78]

No. 12-cv-6051L (DGL), 2014 WL 7174249 (W.D.N.Y. Dec. 17, 2014).

*Gedek* involved allegations that the fiduciaries of Eastman Kodak's ESOP acted imprudently by continuing to invest in Kodak even when it was obvious that the company was heading towards bankruptcy.[79]   The court there held that such a claim differed fundamentally from the claim in *Dudenhoeffer*.   Rather than alleging that "Kodak stock was overvalued, and that the metaphorical bubble was about to burst," the plaintiffs in *Gedek* claimed that "Kodak stock was on a steady decline due to fundamental problems with the company" and that the Kodak plan's fiduciaries "should have realized that Kodak stock represented such a poor long-term investment that they should have ceased to purchase, hold, or offer Kodak stock to plan participants."[80]

Plaintiffs argue that, as in *Gedek*, "regardless of whether the market price of Lehman stock accurately reflected its true market value, Lehman stock was imprudent as a retirement investment due to its excessive risk."[81]   There are at least two problems with plaintiffs' argument.

First, whatever the merits of *Gedek* on its own facts, plaintiffs in this case have not made a true *Gedek*-style claim.   Lehman did not spend months slowly withering in public view such that any observer could have foretold its collapse.   Its ultimate demise was abrupt, market-shaking, and occurred over a period lasting barely longer than a week.[82]   Far from advance notice of impending and certain doom, the Plan Committee Defendants were confronted only with "[m]arket

---

[79]

   *Id.* at *1.

[80]

   *Id.* at *6.

[81]

   DI 232 at 25; *see also* DI 241 at 4-5 & n.6.

[82]

   *See Lehman ERISA I*, 683 F. Supp. 2d at 297-98 (describing events occurring between September 4, 2008, and September 15, 2008, including J.P. Morgan's demand of $5 billion in collateral, as precipitating factors in Lehman's bankruptcy filing).

fluctuations and an above-water price immediately in advance of bankruptcy."[83]   More fundamentally, "risk is accounted for in the market price" of a security,[84] suggesting that plaintiffs' proffered distinction between "riskiness" and "valuation" claims is illusory.  Indeed, the plaintiffs in *Dudenhoeffer* itself alleged not just that Fifth Third Bancorp stock was overvalued, but also that it was "excessively risky"—an assertion they based partly on "public information such as newspaper articles" just as plaintiffs do here.[85]   In the absence of factual allegations justifying a conclusion that "reliance on the market price [was] imprudent,"[86] the Court interprets *Dudenhoeffer* to foreclose breach of prudence claims based on public information irrespective of whether such claims are characterized as based on alleged overvaluation or alleged riskiness of a stock.

Second, plaintiffs argue that *Tibble v. Edison International*,[87] a Supreme Court decision of even more recent vintage than *Dudenhoeffer*, supports their view that the Plan Committee Defendants violated their fiduciary duties.  *Tibble* involved application of ERISA's six-year statute of limitations.[88]  Plaintiffs there asserted that defendants violated their fiduciary duties based on the

---

[83]

    *Rinehart*, 722 F.3d at 151.

[84]

    *In re Citigroup ERISA Litig.*, --- F. Supp. 3d ---, No. 11-cv-7672 (JGK), 2015 WL 2226291, at *14 (S.D.N.Y. May 13, 2015).

[85]

    134 S. Ct. at 2464 ("The complaint alleges that by July 2007, the fiduciaries knew or should have known that Fifth Third's stock was overvalued and excessively risky . . . .").

[86]

    *Id.* at 2472.

[87]

    135 S. Ct. 1823 (2015).

[88]

    *See* 29 U.S.C. § 1113.

alleged imprudence of investing in certain mutual funds added to an ERISA plan in 1999 and 2002.[89] The defendants argued that plaintiffs' claims based on the 1999 additions were untimely because plaintiffs did not file suit until 2007—an argument resting on the view that the relevant date for statute-of-limitations purposes was the date of initial investment.  The Supreme Court rejected that position.  It looked to the law of trusts to conclude that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."[90]  Consequently, a "plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones" and, "so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."[91]

Plaintiffs argue that the Plan Committee Defendants had a continuous duty to monitor the appropriateness of Plan investments under *Tibble* "regardless of whether the market price of the investment fairly value[d] the shares."[92]  On this view, the Plan Committee Defendants are said to have breached their fiduciary duty because they engaged in "no substantive review whatsoever of the prudence of continued investment in Lehman stock from June 2008—even though as of the time of Bear Stearns' collapse it was clear that Lehman was in a highly precarious condition."[93]

---

[89]     135 S. Ct. at 1826.

[90]     *Id.* at 1828 (citing A. HESS, G. BOGERT, & G. BOGERT, LAW OF TRUSTS AND TRUSTEES (3d ed. 2009); A. SCOTT, W. FRATCHER, & M. ASCHER, SCOTT AND ASCHER ON TRUSTS (5th ed. 2007)).

[91]     *Id.* at 1829.

[92]     Ltr. from Daniel W. Krasner to Court at 2 (May 28, 2015) [DI 249].

[93]     DI 232 at 18 (emphasis removed).

It is true of course, as *Tibble* reminds us, that ERISA fiduciaries bear a "continuous duty" to monitor the prudence of investments.  But that truism does not diminish *Dudenhoeffer*'s statement that *Twombly* and *Iqbal* make it difficult as a "general rule" to allege a plausible breach of fiduciary duty based on public information.[94]  Plaintiffs are correct that changed circumstances can trigger a fiduciary's obligation to review the prudence of an investment, but to make out such a claim plaintiffs must allege that circumstances actually have changed sufficiently and that the failure to make such a review injured the plan.  This is precisely what the TCAC fails to do.  Plaintiffs' view seems to be that once Bear Stearns collapsed, the ERISA fiduciaries of every major financial institution's ESOP bore a fiduciary duty to re-evaluate the prudence of continued investment in a sponsor's securities.  The Court has rejected this argument before.[95]  In any case, plaintiffs allege no facts to suggest that the review they claim should have been done would have averted the injury that ultimately occurred when Lehman later collapsed.  This is critical here when, as the Circuit said in *Rinehart*, public information at the time reflected a din of mixed and conflicting signals.[96]  Accordingly, it would be pure speculation to say that a meeting or other review by the Plan Committee would or should have resulted in the slightest change of course or otherwise prevented the consequences of Lehman's ultimate demise.  Neither *Dudenhoeffer* nor *Tibble* permits ERISA

---

[94]

*Dudenhoeffer*, 134 S. Ct. at 2471.

[95]

*Lehman ERISA II*, 2011 WL 4632885, at *5 ("[P]laintiffs allege that Bear Stearns's collapse ultimately is what put, or should have put, defendants on notice of the allegedly dire situation of Lehman.  But this argument is not supported by any concrete factual allegations sufficient to make a plausible claim.  The SCAC . . . alleges no facts explaining *why* Bear Stearns suffered a run, let alone why those circumstances alerted or ought to have alerted Lehman that it would suffer the same fate.").

[96]

*Rinehart*, 722 F.3d at 151.

claims to withstand challenge based on such threadbare allegations.

      *Third*, plaintiffs embrace *Dudenhoeffer*'s "special circumstances" exception outright by attempting to allege conditions that, they contend, would have rendered Plan Committee reliance on Lehman's market price imprudent.  *Dudenhoeffer* does not provide examples of what such special circumstances might be, but it explains that investors normally are able to rely on a "security's market price as an unbiased assessment of the security's value in light of all public information."[97] The question, then, is whether plaintiffs have alleged facts that plausibly suggest that the Plan Committee Defendants were or should have been aware that Lehman was a riskier investment than its market price would have indicated.

      Plaintiffs rely on certain July 2008 SEC orders not previously mentioned in the SCAC.[98]  Indeed, they appear to have been alerted to them by the Second Circuit's opinion in *Rinehart*.[99]

---

[97]

      *Dudenhoeffer*, 134 S. Ct. at 2471 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2411 (2014)).

[98]

      *See* TCAC ¶ 315 (discussing *Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments*, Release No. 58166, July 15, 2008, *available at* http://www.sec.gov/rules/other/2008/34-58166.pdf) ("July 15 Order")); *see also Amendment to Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments*, Release No. 58190, July 18, 2008, *available at* https://www.sec.gov/rules/other/2008/34-58190.pdf ("July 18 Order").

[99]

      The Circuit wrote:

      "We assume for these purposes that markets operate efficiently.  Any other assumption is incompatible with developing a workable standard.  Although Plaintiffs did not raise the issue in either the CAC, the SCAC or their briefs on appeal, we note two SEC Orders from July 2008 that had the potential to affect market efficiency during the class period.  In July 2008, in order to 'maintain fair and orderly securities markets,' the SEC prohibited short selling securities of certain large financial firms, including Lehman.  Because Plaintiffs did

In order to assess whether the SEC orders constituted or described a special circumstance, we begin by stating with precision just what the orders actually said.  The SEC's July 15 Order warned that "[f]alse rumors can lead to a loss of confidence in our markets" and that, "[a]s a result, the prices of securities may artificially and unnecessarily decline well below the price level that would have resulted from the normal price discovery process."[100]  In particular, the SEC identified misleading press reports regarding the "unwillingness of key counterparties to deal with certain financial institutions" and "rumors that financial institutions are facing liquidity problems,"[101] both of which "threaten[ed] significant market disruption."[102]  The SEC "concluded that there now exists a substantial threat of sudden and excessive fluctuations of securities prices generally and disruption in the functioning of the securities markets that could threaten fair and orderly markets."[103] It therefore prohibited short sales of the securities of certain firms "unless [the short selling] person or its agent has borrowed or arranged to borrow the security or otherwise has the security available to borrow in its inventory."[104]  An appendix identified nineteen financial institutions within the

---

not allege that the Benefit Committee Defendants knew or should have known about the SEC Orders or the potential effect they may have had on the market's valuation of Lehman stock, we do not consider the uncertain impact of this temporary regulation." *Rinehart*, 722 F.3d at 149 n.10 (internal citations omitted).

[100]   July 15 Order at 1.

[101]   *Id.* at 2.

[102]   *Id.*

[103]   *Id.*

[104]   *Id.* at 3-4.

Order's scope, including Lehman.[105]

On July 18, 2008, the SEC made exceptions to the July 15 Order for transactions by certain *bona fide* market makers, sales of certain restricted securities, and short sales by underwriters or related syndicates.[106]  On July 29, the SEC extended the short selling restrictions for up to thirty additional days.[107]  It stated that "the emergency still exists" and that it had "determine[d] that an extension is necessary in the public interest and for the protection of investors to maintain fair and orderly securities markets."[108]

Plaintiffs allege that the market for Lehman stock therefore faced "unusual and extraordinary circumstances" during the class period and that the SEC "artificially protected" the companies identified in its orders.[109]  Plaintiffs contend that "[i]f these allegations [did] not constitute 'a special circumstance' affecting the reliability of the market price, it is difficult to contemplate *any* allegations that would suffice."[110]

Whether the SEC's July 2008 orders were or described special circumstances under *Dudenhoeffer* is a novel question.   The Court ultimately concludes that the SEC orders are

---

[105]      *Id.* at 5.

[106]      July 18 Order at 1-3.

[107]      *Order Extending Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments*, Release No. 58248, July 29, 2008, *available at* https://www.sec.gov/rules/other/2008/34-58248.pdf ("July 29 Order"); *see also* TCAC ¶ 324.

[108]      *Id.* at 1.

[109]      TCAC ¶¶ 315, 325.

[110]      DI 241 at 11 (emphasis in original).

24

insufficient to sustain a claim that the Plan Committee Defendants breached their fiduciary duties based on public information.

In the first place, the SEC never announced that the market for Lehman stock had ceased to function efficiently.  It instead said that rumor-mongering "*may* artificially and unnecessarily" depress security prices and that it was acting to "eliminate any possibility that naked short selling" *could* contribute to such disruption.[111]  The difference is significant.  Action taken to prevent a negative effect is not the same thing as declaring that such an effect already had become manifest.  *Rinehart* itself noted that "[a]lthough Lehman's share price exhibited a downward trend overall during the spring and summer of 2008, the daily price per share fluctuated widely."[112] Indeed, even in Lehman's "final hours the market viewed the 158-year-old company as a going concern by assigning it a positive expected value."[113]  The only plausible inference supported by the TCAC is that the market processed any risks identified in the SEC's orders as it would have processed any other public information about Lehman.  *Dudenhoeffer* bars claims based on such public information precisely because the market is competent to react to it.

In any case, even if the SEC's orders accurately were read as saying that short selling actually had affected Lehman's stock price, the Commission's point was that it had *depressed* the stock price to an artificially low level.  In other words, the SEC believed that the stock was worth *more*—and that the stock therefore was *less risky*—than its artificially depressed market price had made it appear.  Thus, the Commission's July 2008 orders, rather than having been a special

---

[111]        July 15 Order at 1, 3 (emphasis added).

[112]        *Rinehart*, 722 F.3d at 149.

[113]        *Id.*

circumstance making imprudent continued reliance on the Lehman share price as a basis for holding Lehman stock in the ESOP, cut in precisely the opposite direction.  That Lehman later collapsed should not obscure the fact that the SEC's orders suggested that any possible downward pressure on Lehman's stock price caused by naked short selling created the inaccurate impression that Lehman was riskier than it actually was.

The fact that the July 15 Order referred to "rumors spread about liquidity problems at Bear Stearns"[114] before its March 2008 collapse warrants no different conclusion.  It merely indicated a concern that, like Bear Stearns, the nineteen institutions it identified were susceptible to false rumors about their liquidity.  But this provided the market with no new information.

To sustain a breach of fiduciary duty claim, the TCAC must allege facts or circumstances sufficient to have alerted the Plan Committee Defendants that Lehman was an imprudent investment.  Neither the July 2008 SEC orders nor anything else in the TCAC meet that standard.  Accordingly, the Court dismisses Counts I and II of the TCAC because they fail to allege plausibly that the Plan Committee Defendants breached their duty of prudence based on public information.

C.      *Count III: Breach of Fiduciary Duty Based on Nonpublic Information*

Count III alleges that the Plan Committee Defendants were imprudent based on *nonpublic* information.  Plaintiffs do not claim that the Plan Committee Defendants in fact possessed

---

[114]      July 15 Order at 1.

26

any negative inside information about Lehman.[115]   Rather, they allege that the Plan Committee

Defendants were obligated to undertake an investigation into Lehman's soundness as an investment

and that, had they done so, they *would have uncovered* such information.[116]   This allegedly included

undisclosed exposure to market risk, over-valuation of positions in mortgage-backed securities and

commercial real estate, excessive leverage, the use of Repo 105 "to artificially and temporarily

reduce Lehman's net leverage ratio," and inadequate internal controls.[117]   The TCAC alleges also

that the Plan Committee Defendants would have uncovered through an adequate investigation

"what, at minimum, the Director Defendant Fuld actually knew."[118]   In addition to the foregoing,

that allegedly included (i) urgent warnings from Treasury Secretary Paulson to Fuld in April and

August 2008 regarding risks facing the company,[119] (ii) the fact that Secretary Paulson, with Fuld's

knowledge, had directed the Federal Reserve to create a contingency plan for a possible Lehman

---

[115]

See Rinehart, 722 F.3d at 147 n.7 ("This is not a case in which fiduciaries in charge of day-to-day plan management already knew material, nonpublic information by virtue of their corporate insider status."); *Lehman ERISA I*, 683 F. Supp. 2d at 300-01 (the CAC "is devoid of any factual allegations that [Plan Committee Defendant] Uvino knew or should have known any negative information that she was obliged to disclose or that she knowingly made any inaccurate statements.").

[116]

TCAC ¶¶ 5(c), 285; DI 232 at 28 ("Plaintiffs withdraw their allegations regarding the [Plan Committee Defendants] actual knowledge of material non-public information. However, although it is not alleged that [they] actually possessed crucial non-public information regarding Lehman's financial condition, a reasonable investigation . . . would have uncovered the material non-public information . . . which they had a duty to investigate.").

[117]

TCAC ¶ 436.

[118]

*Id.*; *see also* DI 241 at 11.

[119]

TCAC ¶¶ 253, 326, 328.

27

bankruptcy,[120] and (iii) Fuld's efforts to find a buyer or strategic partner in the months preceding Lehman's bankruptcy.[121]

Count III raises the fundamental issue of whether ERISA fiduciaries even *have* a duty to attempt to investigate nonpublic information.  In *Rinehart*, the Second Circuit said "no."  It reasoned that ERISA requires fiduciaries only to discharge their obligations "within the bounds of the law"[122] and that a duty to investigate inside information would force ERISA fiduciaries into constant conflicts between discharging their duties and risking the commission of insider trading.[123] *Dudenhoeffer* altered the landscape by making clear that claims based on nonpublic information—at least where defendants are corporate insiders—no longer may be rejected out of hand solely because of concerns born of the insider trading laws.  Rather, plaintiffs may allege "an alternative action that the defendant could have taken that would have been consistent with the securities laws,"[124] such as disclosing the information to the public or ceasing to offer the ESOP as an investment option.[125] Courts reviewing such allegations must "consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases . . . or publicly disclosing negative information would do more harm than good to the fund

---

[120]

    *Id.* ¶ 327.

[121]

    *Id.* ¶¶ 297, 352, 373.

[122]

    722 F.3d at 147.

[123]

    *Id.*

[124]

    *Dudenhoeffer*, 134 S. Ct. at 2472.

[125]

    *Id.* at 2473.

by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund."[126]  Granting that *Dudenhoeffer* concluded that *some* claims of breach of fiduciary duty based on nonpublic information may be cognizable, that alone does not get plaintiffs to their desired destination.

We begin by recognizing that there is a significant difference between *Dudenhoeffer*, which involved allegations that defendants "behaved imprudently by failing to act on the basis of nonpublic information that was available to them because they were Fifth Third insiders,"[127] and the claim here—viz. that the Plan Committee Defendants breached their fiduciary duty by failing to pursue insider information held by *others*.  Plaintiffs' view seems to be that there is a quantum of negative information about an ESOP sponsor which, while perhaps insufficient to render continued investment in the sponsor's stock imprudent, nonetheless would be troubling enough that a prudent person would make further inquiries of corporate insiders.  Whether this view is correct—that is, whether a duty to investigate nonpublic information even exists—is not a question with which the Court need grapple in the present circumstances.  Assuming *arguendo* that such a duty does exist, plaintiffs' allegations are otherwise insufficient.

In the first place, and as plaintiffs themselves recognize elsewhere in the TCAC, much of the information that the Plan Committee Defendants allegedly were obliged to investigate was public during the proposed class period.[128]

---

126

       *Id.*

127

       *Id.* at 2472 (emphasis removed).

128

       TCAC ¶ 417 (describing "[a] plethora of widely publicized information that was more than sufficient for the sophisticated Defendant fiduciaries to conclude . . . that Lehman stock was far too risky for retirement savings and that they should have stopped purchasing additional

More fundamentally, the TCAC nowhere explains in a non-conclusory fashion *how* plaintiffs' hypothetical investigation would have uncovered the alleged inside information. There are no specific allegations about what lines of inquiry would have revealed this information or who, if pressed, in fact would have disclosed it to the Plan Committee Defendants. The supposition seems to be that if the Plan Committee Defendants had asked questions touching on any of the categories of allegedly undisclosed information identified in the TCAC, Fuld (or someone with equal access to insider information) would have provided the Plan Committee Defendants with all relevant facts *tout de suite*. But such conjecture is not enough. The Second Circuit's decision in *Citigroup* makes clear that conclusory allegations about the results of a hypothetical investigation are insufficient to survive a motion to dismiss.[129] In circumstances where, as here, plaintiffs concede that defendants did not possess inside information, plaintiffs must be able to allege with specificity how a hypothetical investigation would have elucidated risks allegedly known only to corporate insiders or otherwise would have alleviated the purported harm to ESOP beneficiaries caused by the alleged breach. The TCAC fails to do so.

Plaintiffs fail to surmount yet another hurdle. Even assuming that a duty to investigate nonpublic information existed, and assuming further that the Plan Committee Defendants would have uncovered that information, plaintiffs still must satisfy *Dudenhoeffer*'s requirement that the complaint "plausibly allege[] that a prudent fiduciary in the defendant's position could not have

---

shares and divested the Plan of its current Lehman stock holdings.").

[129]

*Citigroup*, 662 F.3d at 141 ("Moreover, that the fiduciaries allegedly failed to investigate the continued prudence of investing in Citigroup stock cannot alone rescue plaintiffs' claim; plaintiffs have not pled facts that, if proved, would show that such an investigation during the Class Period would have led defendants to conclude that Citigroup was no longer a prudent investment.").

concluded that stopping purchases . . . or publicly disclosing negative information would do more harm than good to the fund."[130]

Plaintiffs attempt to satisfy this requirement by alleging that the "myriad of alarming facts" about Lehman that came to light during the class period was so disconcerting that "it is hard to fathom" that any alternative course of action, including termination of the ESOP or disclosing the alleged inside information, "would have . . . caused Lehman stock to move palpably [given] the parade of truly material news repeatedly shocking Lehman investors."[131]  Yet one reasonably might ask, if this were true, whether the alleged inside information was material at all.[132]  Indeed, the TCAC in substance affirmatively alleges that no alternative action by the Plan would have altered the total mix of publicly available information.[133]  But even putting that aside, the Court previously concluded that divesting the Plan of Lehman stock "would have accelerated Lehman's collapse and reduced the Plan's value."[134]  The TCAC's allegations about the SEC's July 2008 orders only reinforce this conclusion, given the SEC's concerns over the market's jittery reaction to false rumors in the early days of the financial crisis.

All of this of course raises the question of how, on a motion to dismiss and drawing all inferences in plaintiffs' favor, courts should evaluate claims about whether an ESOP fiduciary's

---

[130]

*Dudenhoeffer*, 134 S. Ct. at 2473.

[131]

TCAC ¶ 442.

[132]

*See Citigroup*, 2015 WL 2226291, at *15 (suggesting that if adverse nonpublic information can be released without harming a company, then such information is not really material).

[133]

*See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[134]

*Lehman ERISA I*, 683 F. Supp. 2d at 303 n.65.

actions would have caused "more harm than good" to ESOP participants.  Plaintiffs insist that this

question ought to be a matter for expert proof and is inappropriate for disposition on a motion to

dismiss.[135]  At least one court has adopted this view.[136]  Another, however, has rejected such claims

at the motion to dismiss stage after determining that the only plausible inference on the facts before

it was that the consequences of disclosing damaging inside information "likely would have been

dire."[137]  While this Court is highly skeptical that terminating the Plan as an investment option or

disclosing the alleged inside information would have helped the Plan more than hurt it, it need not

resolve the question of how to assess such claims on a Rule 12(b)(6) motion given the previously

enumerated respects in which plaintiffs' duty to investigate claim is insufficient.

The Court therefore dismisses Count III.  It plausibly alleges neither that the Plan

Committee Defendants breached their fiduciary duties based on the failure to investigate nonpublic

information nor that any such investigation would have resulted in averting the harm that ultimately

befell the Plan when Lehman suddenly collapsed.

## III.     *Claims Against Defendant Fuld*

Count IV of the TCAC, which alleges that Fuld breached his duty to monitor the Plan

Committee Defendants, in fact raises two distinct claims.  The first is that Fuld failed adequately to

---

[135]

DI 232 at 31.

[136]

*In re BP P.L.C. Sec. Litig.*, No. 10-md-2185 (KPE), 2015 WL 1781727, at *16-17 (S.D. Tex. Mar. 4, 2015) (concluding, "with some consternation," that whether a course of action "would do more harm than good" is a question for expert testimony and is not amenable to resolution at the motion to dismiss stage).

[137]

*In re HP ERISA Litig.*, No. 12-cv-6199 (CRB), 2015 WL 3749565, at *8 (N.D. Cal. June 15, 2015).

monitor the Plan Committee Defendants.[138]  The second is that he had inside information about the precariousness of Lehman's position and failed to disclose it to the Plan Committee Defendants so that they could evaluate the prudence of continuing to invest in Lehman on a fully-informed basis.[139]

These claims rest on two quite different conceptions of Fuld's fiduciary duty.  The first—what we might call a traditional duty to monitor claim—posits that (i) the Plan Committee Defendants acted imprudently, (ii) Fuld knew or should have known this, and (iii) Fuld failed to take steps to protect the Plan from the Committee Defendants' alleged imprudence.[140]  This kind of claim is derivative of a primary breach of fiduciary duty in the sense that a monitoring fiduciary's liability arises from a failure to respond properly to the wrongdoing of others.

The second theory—plaintiffs' duty to inform claim—is different.  It asserts that Fuld (i) was obliged in monitoring the Plan Committee Defendants to ensure that they had access to all information material to deciding whether Lehman was a prudent investment, (ii) possessed nonpublic information indicating that Lehman was riskier than the public realized, and (iii) violated his fiduciary duties under ERISA by failing to share that information with the Plan Committee.[141]  Such a claim does not depend on a primary breach because, on this theory, the monitoring fiduciary would be responsible for his or her *own* failure to disclose information to persons entitled to receive it. Plaintiffs contend that a monitoring fiduciary can be liable on this view even when the monitored

---

138

TCAC ¶ 452.

139

*Id.* ¶ 456 ("By remaining silent and continuing to withhold such information from the other fiduciaries, [Fuld] breached his monitoring duties under the Plan and ERISA.").

140

*Id.* ¶ 454.

141

*Id.* ¶ 456.

fiduciaries have done nothing wrong.  They argue that even if the Plan Committee Defendants acted

prudently in light of all information available to them, they did not "appreciate[] the huge risk of

significant investment" in Lehman because Fuld hid those risks from them.[142]


A.       The Duty to Monitor Claim

In *Lehman ERISA II*, the Court concluded that "the Director Defendants were

fiduciaries to the extent they appointed the Compensation Committee, which in turn appointed the

Plan Committee, to manage the Plan."[143]  It dismissed plaintiffs' duty to monitor claim against the

Director Defendants, including Fuld, because it was "derivative of the primary claim that the Plan

Committee Defendants breached a duty of prudence and therefore fails along with that contention."[144]

*Rinehart* affirmed the Court's dismissal on this ground, stating that "[p]laintiffs cannot maintain a

claim for breach of the duty to monitor by the Director Defendants absent an underlying breach of

the duties imposed under ERISA by the [Plan] Committee Defendants."[145]

Nothing in *Dudenhoeffer* changes this analysis.  The Court therefore adheres to its

and the Circuit's prior decisions.  The duty to monitor claim against Fuld fails because the TCAC

fails to allege plausibly any primary breach of fiduciary duty on the part of the Plan Committee

Defendants.

---

[142]

*Id.* ¶ 453.

[143]

2011 WL 4632885, at *6.

[144]

*Id.* at *8.

[145]

722 F.3d at 154.

B.      *The Duty to Inform Claim*

Plaintiffs' second claim against Fuld presupposes that ERISA requires appointing

fiduciaries to keep their appointees apprised of material, nonpublic information that conceivably

could affect the plan fiduciaries' evaluation of the prudence of investing in a plan sponsor's

securities.

There is no controlling decision of the Second Circuit on this question, although

several courts in this district have concluded that such claims are permissible.[146]  One court outside

this district, citing these cases, has commented that "duty to inform" claims have "gained reasonably

wide acceptance" and "even those courts that have seemed less inclined to unequivocally endorse

the duty to inform have found it inappropriate to dismiss such a claim on a Rule 12(b)(6) motion."[147]

Other courts have hewn to the view that duty to inform claims are not viable absent a primary breach

by monitored fiduciaries.[148]  Plaintiffs now argue that *Dudenhoeffer* supports recognizing such claims

because it stated that inaction in the face of nonpublic information *may* trigger liability under ERISA

---

[146]

       *See, e.g.*, *In re Pfizer Inc. ERISA Litig.*, No. 04-cv-10071 (LTS), 2009 WL 749545, at *9 (S.D.N.Y. Mar. 20, 2009) ("The Director Defendants, who were 'privy to' or 'had access to' 'information at the highest level' of the company, knew or should have known about adverse material information . . . yet they neglected 'to provide complete and accurate information' to other plan fiduciaries including the Committee Defendants."); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005) ("Plaintiffs' allegation that DiCamillo failed to adequately monitor or keep the Plan Administrators and Fund Managers informed states a claim for breach of fiduciary duty."); *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 765 (S.D.N.Y. 2003) (sustaining claim that former CEO breached his fiduciary duty by withholding "material facts he knew or should have known about the financial condition of WorldCom.").

[147]

       *Woods v. Southern Co.*, 396 F. Supp. 2d 1351, 1373-74 (N.D. Ga. 2005).

[148]

       *See, e.g.*, *Citigroup*, 2015 WL 2226291, at *15 ("In any event, the plaintiffs cannot show that the defendants failed to share information with their co-fiduciaries if there was no antecedent breach which that information would serve to ameliorate.").

in certain circumstances.[149]

The Court concludes that ERISA does not impose a duty on appointing fiduciaries to keep their appointees apprised of nonpublic information. The Court therefore dismisses Count IV's duty to inform claim because it is impermissible as a matter of law. It does so for at least three reasons.

*First*, nothing in ERISA itself or in traditional principles of trust law creates such a duty. An ERISA fiduciary must discharge his or her duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[150] As the Court already has explained, the ERISA statute imposes fiduciary duties only "to the extent [that a person] exercises any discretionary authority or discretionary control respecting management" of an ERISA plan or "has any discretionary authority or discretionary responsibility in the administration" of such a plan.[151] Here, Fuld was an ERISA fiduciary only to the extent that he appointed others to manage the Lehman Plan. Plaintiffs' conception of the proposed duty to inform would transform Fuld's limited obligations under ERISA into all-encompassing ones. Whenever Fuld received information in any business capacity, he would have been obliged to consider whether ERISA required disclosure of that information to the Plan Committee. But those who assume fiduciary status do so only when and to the extent that they function in their capacities

---

[149]

DI 241 at 13.

[150]

29 U.S.C. § 1104(a)(1)(B).

[151]

29 U.S.C. § 1002(21)(A) (quoted in relevant part).

as fiduciaries, not "when they conduct business that is not regulated by ERISA."[152]  By effectively turning *all* of Fuld's business duties into ERISA duties, plaintiffs' proposed duty to inform would stretch the concept of fiduciary duty far beyond what ERISA contemplates.  Moreover, it would create endless conflicts of interest between duties of corporate employees to act in the best interests of their employers, often by keeping information confidential, and newly imposed duties to disclose confidential employer information to plan fiduciaries.

Furthermore, an "ERISA fiduciary's duty is 'derived from the common law of trusts'"—and trust law provides little support for plaintiffs' position.[153]  According to the Third Restatement of Trusts, an appointing fiduciary has a "duty to act with prudence in supervising or monitoring the agent's performance and compliance with the terms of the delegation,"[154] and to "provid[e] the agent with substantive direction and guidance consistent with the terms and purposes of the trust."[155]  But an initial obligation to provide direction is hardly the same thing as an ongoing obligation to share inside information.  Another treatise states that "[i]f a trustee is negligent in selecting, instructing or supervising an agent or employee, he will be held liable to the beneficiary for any resulting loss."[156]  One might think that "instructing" here denotes something similar to plaintiffs' concept of "informing," but the treatise goes on to explain that "instructing" in this context

---

[152]

    *Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991).

[153]

    *Tibble*, 135 S. Ct. at 1828 (quoting *Central States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985)).

[154]

    RESTATEMENT (THIRD) OF TRUSTS § 80 cmt. d(2).

[155]

    *Id.*

[156]

    A. HESS, G. BOGERT, & G. BOGERT, LAW OF TRUSTS AND TRUSTEES § 557.

is congruent with the requirements of Uniform Trust Code § 807(a)(2), which states only that a trustee "shall exercise reasonable care, skill, and caution in . . . establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust."[157]  This is very different from a duty continuously to provide appointees with information that might (or might not) assist them in carrying out their duties.  So far as the Court is able to discern, the law of trusts does not impose a continuing duty to inform on appointing fiduciaries.

*Second*, the Court of Appeals consistently has rejected efforts to impose additional disclosure obligations upon ERISA fiduciaries.  While "[f]iduciary liability may . . . arise from a fiduciary's material omissions, or failure to speak," the Second Circuit's "decisions have narrowed a fiduciary's affirmative duty of disclosure to a limited number of circumstances."[158]  To take a few examples, *Pocchia v. NYNEX Corp.*[159] held that an ERISA fiduciary has no duty to disclose proposed changes to a company's retirement plan to a retiring employee, in part because "[i]nsisting on voluntary disclosure during the formulation of a plan and prior to its adoption would . . . increase the likelihood of confusion on the part of beneficiaries and, at the same time, unduly burden management, which would be faced with continuing uncertainty as to what to disclose and when to disclose it."[160]  In *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*,[161] the

---

[157]

   *Id.*

[158]

   *Bell v. Pfizer, Inc.*, 626 F.3d 66, 75 n.4 (2d Cir. 2010).

[159]

   81 F.3d 275 (2d Cir. 1996).

[160]

   *Id.* at 278.

[161]

   107 F.3d 139 (2d Cir.1997).

Circuit held that a plan administrator has no affirmative duty to disclose actuarial valuation reports because it would be "inappropriate to infer an unlimited disclosure obligation [under ERISA] on the basis of general provisions that say nothing about disclosure."[162]  *Citigroup* rejected the notion that plan administrators must disclose nonpublic information to plan beneficiaries, reasoning that fiduciaries "do not have a duty to give investment advice or to opine on the stock's condition."[163] Finally, while *Rinehart* itself did not settle the question of whether a duty to inform exists, it stated that the Circuit "would be unlikely to conclude that the Director Defendants had [such] a duty."[164]

The thrust of these cases is unmistakable.  The Circuit has stated that ERISA "imposes a comprehensive set of reporting and disclosure requirements, which comprises part of 'an elaborate scheme . . . for enabling beneficiaries to learn their rights and obligations at any time.'"[165]  Adding additional requirements to this complex statutory apparatus is not to be undertaken lightly.  As the Eleventh Circuit put it when it, like the Second Circuit in *Citigroup*, rejected a duty to disclose nonpublic information to plan beneficiaries:

---

[162]

     *Id.* at 146-47.

[163]

     662 F.3d at 143.

[164]

     722 F.3d at 154.

[165]

     *Bell*, 626 F.3d at 74 n.3 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)).

"We will not create a rule that converts fiduciaries into investment advisors. Such a rule would force them to guess whether, and if so to what extent, adverse nonpublic information will affect the price of employer stock, and then would require them to disclose that information to the plan participants if they believe that the information will have a materially adverse effect on the value of the investment fund. There are, of course, also practical problems with such a rule. It would be difficult, if not impossible, to whisper nonpublic information into the ears of tens of thousands of plan participants without it becoming immediately available to the market as a whole, thus blowing any benefit to the participants. And even if it were possible to disclose nonpublic information to all plan participants without that information becoming generally known, the participants have no legal claim to it. The only way selective disclosure could benefit them would be if it gave participants an advantage in the market over non-participants, and they are not entitled to that advantage."[166]

Here, too, plaintiffs advocate for a rule that would require appointing fiduciaries "to whisper nonpublic information into the ears" of their appointees. As noted, the result would be ceaseless conflict between duties of officers, directors and other company employees, which run to the company and its shareholders,[167] and the duties of ERISA plan fiduciaries, which run to plan beneficiaries.[168] Under such a regime, plan fiduciaries who disagree with company officers over the disclosure obligations of the securities laws, and who might indeed "be egregiously wrong" in their assessments, could shield themselves from ERISA liability only "by disclosing any *arguable* violation . . . even when [such a] course of action would have disastrous consequences for the share

---

[166]

    *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1285-86 (11th Cir. 2012).

[167]

    *See, e.g.*, *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

[168]

    *Bell*, 626 F.3d at 73 ("Section 404 of ERISA imposes fiduciary duties on administrators of ERISA retirement plans that, in pertinent part, require a fiduciary to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . .'" (quoting 29 U.S.C. § 1104(a)(1))).

price."[169]  In light of existing precedent and the morass that would result from such a rule, this Court rejects the proposed duty to inform.

        *Third*, *Dudenhoeffer* does not help plaintiffs as much as they claim.

        As an initial matter, plaintiffs recognize that *Citigroup*'s rejection of a duty to share nonpublic information with plan beneficiaries and *Rinehart*'s statement that the Circuit would be "unlikely" to impose such a duty an appointing fiduciaries counsel strongly against their position. They argue that the Second Circuit's statements in these cases were *dicta* and, in any event, that both cases have been "superseded by *Dudenhoeffer*."[170]  The Court disagrees.

        The fact that *Dudenhoeffer* contemplated that the duty of prudence might be breached based on nonpublic information, so long as plaintiffs allege "an alternative action that the defendant could have taken that would have been consistent with the securities laws,"[171] is not dispositive of whether an appointing fiduciary has a duty to disclose inside information.  Moreover, *Citigroup*'s conclusion that ERISA fiduciaries have no obligation to disclose nonpublic information to plan beneficiaries did not turn solely on a fear of inciting insider trading, but also on the quite separate ground that ERISA did not require fiduciaries to act as investment advisors.[172]  The Court concludes that the guidance of *Citigroup* and *Rinehart* remains persuasive even after *Dudenhoeffer*, notwithstanding plaintiffs' assertions to the contrary.

---

[169]
    *Harris v. Amgen, Inc.*, --- F.3d ---, No. 10-56014, 2015 WL 3372373, at *8 (9th Cir. May 26, 2015), *amending prior decision at* 770 F.3d 865 (9th Cir. 2014) (Kozinski, J., dissenting from denial of rehearing *en banc*).

[170]
    *See* DI 241 at 13.

[171]
    134 S. Ct. at 2472.

[172]
    *Citigroup*, 662 F.3d at 143.

Finally, plaintiffs argue that the evolution of this multidistrict litigation favors their position. They point out that the substance of what Fuld allegedly withheld from the Plan Committee overlaps with statements that the Court previously ruled could support plausible claims by Lehman shareholders that Fuld violated the securities laws.[173]   Indeed, this is true.   But ERISA and the securities laws ultimately have differing objectives pursued under entirely separate statutory schemes designed to protect different constituencies—ERISA plan beneficiaries in the first instance and purchasers and sellers of securities in the second.[174]   While "the true objects of Plaintiffs' ire" may well be "the Lehman executives whom Plaintiffs allege made material misstatements regarding the financial health of the company"[175] to the detriment of participants in the securities markets, ERISA is not the statutory mechanism to pursue such claims.

Count IV fails to allege a plausible duty to monitor claim in the absence of a breach of fiduciary duty.   Its separate claim that Fuld violated a fiduciary duty to provide the Plan Committee Defendants with nonpublic information fails as a matter of law.

---

[173]

DI 232 at 29-30 (discussing the Court's opinion in *In re Lehman Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011)).

[174]

*But see Harris*, 2015 WL 3372373, at *19 ("If the alleged misrepresentations and omissions, scienter, and resulting decline in share price in [the parallel securities litigation] were sufficient to state a claim that defendants violated their duties under Section 10(b), the [same facts] are sufficient to state a claim that defendants violated their duty of care under ERISA.").

*Harris* suggests that a violation of the securities laws necessarily entails a violation of ERISA duties, at least in certain circumstances.   *Harris* never states with precision, however, whether a duty to inform applies to appointing fiduciaries *when their appointees are not alleged to have acted imprudently*.   The Court's decision here does not address cases in which the same persons are alleged to be fraudsters under the securities laws and imprudent managers under ERISA.

[175]

*Rinehart*, 722 F.3d at 151.

*Conclusion*

Accordingly, defendants' motions to dismiss the TCAC are granted.  The Clerk shall terminate docket items 227 and 243 in case no. 08-cv-5598 and enter judgment and close that case. The Clerk shall terminate also docket items 1583 and 1586 in case no. 09-md-2017.

SO ORDERED.

Dated:        July 10, 2015

/s/  Lewis A. Kaplan

_____

Lewis A. Kaplan
United States District Judge